COMDYNE I, INC. (formerly known as Corbin Sales Corporation)

v.

George T. CORBIN, Jr., Corbin Sales Corp., Corbin Superior Composites, Inc.

Appeal of George T. CORBIN, Jr., Corbin Sales Corporation, Corbin Superior Composites, Inc., and Clifford L. Van Syoc, Esquire.

No. 89–5915.

United States Court of Appeals, Third Circuit.

Argued June 25, 1990.

Decided July 20, 1990.

Charles H. Nugent, Jr. (argued), Francis J. Hartman, Chartered, Moorestown, N.J., for appellants, George T. Corbin, Jr., Corbin Sales Corp. and Corbin Superior Composites, Inc.

Steven J. Fram (argued), Archer & Greiner, P.C., Haddonfield, N.J., for appellee.

Before: SLOVITER and MANSMANN, Circuit Judges, and FULLAM, District Judge *.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

*Facts and Procedural History*

The following facts are taken from the Amended Complaint of appellee Comdyne, Inc. (Comdyne). George T. Corbin, appellant, was the founder and, until 1982, a director and the sole shareholder of Corbin Sales Corporation, a company in the business of manufacturing and selling filament-wound cylinders used primarily in national defense contracts. On August 2, 1982, Corbin sold 100% of the stock in the corporation to Johnson Industries Corporation. Corbin remained as an executive of Corbin Sales Corporation until on or about December 28, 1984.

In 1984, Corbin Sales Corporation changed its official corporate name to Comdyne I, Inc., and identified itself as "Comdyne I, Inc. (formerly known as Corbin Sales Corporation)." It continues to be listed as Corbin Sales Corporation in federal government procurement manuals and vendor codes, industrial directories, telephone directories, and other business documents. Comdyne claims that a number of its products bear the name "Corbin Sales Corporation" or its logo "CSC."

On or about July 31, 1986, Corbin formed "Corbin Sales Corporation," and on or about September 3, 1986, he formed a second corporation, "Corbin Superior Composites, Inc." Although Corbin Sales Corporation never did any business and was dissolved on January 7, 1987, Corbin Superior Composites began to manufacture and sell filament-wound composite cylinders. Comdyne alleged, *inter alia*, that Corbin contacted customers and vendors of Comdyne on stationery which identified him as an employee of "Corbin Superior Composites, Inc. (formerly Corbin Sales Corporation)" and used the same "CSC" logo that was being used by Comdyne.

Additionally, Comdyne alleged that Corbin "has publicly stated that plaintiff has defrauded the United States Government by falsely representing the history of manufacture of certain composite cylinders; that plaintiff made 'serious and unauthorized' changes in the design of certain composite cylinders, which changes made plaintiff's products inferior and not in conformity with government specifications; and that plaintiff tampered with welds on certain nitrogen receivers, and changed and falsified serial numbers on certain nitrogen receivers to cover up failed welds, thereby defrauding the United States Government, endangering military personnel and engaging in criminal activity." App. at 48.

Comdyne filed a three count complaint against Corbin and his newly formed corporations (jointly referred to as Corbin) on April 15, 1987, alleging federal trade name infringement, federal unfair competition and infringement and unfair competition under New Jersey law. On August 28,

---

* Hon. John P. Fullam, Senior Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1987, Corbin filed his Answer and a Counterclaim containing eight counts. Counts One through Four asserted claims arising out of the original sale of the business and Corbin's subsequent employment by Comdyne. The remaining four counts, arising out of Corbin's post-employment competition with Comdyne, alleged malicious and intentional interference with his prospective economic advantage, slander and defamation, abuse of process, and a violation of civil RICO. Comdyne filed a motion to dismiss Counts Five through Eight of Corbin's counterclaim for failure to state a claim on September 21, 1987. Some time thereafter, defense counsel deposed Comdyne's President, Robert S. Berrisford, over a two-day period during which Berrisford testified under oath that the factual underpinnings for Counts Five through Eight of Corbin's counterclaim were false.

On June 1, 1988, Comdyne filed an amended complaint, with leave of court, in which it added as Counts Four and Five allegations of trade libel and product disparagement. Defendants failed to answer the amended complaint and a default was entered by the Clerk of the district court against them on July 7, 1988 pursuant to Comdyne's motion under Fed.R.Civ.P. 55(a). Defendants did not move to have the entry of default vacated or set aside under Fed.R.Civ.P. 55(c).

Both before and after the entry of the default, defendants failed to comply with a series of discovery orders of the district court and the magistrate. Initially, the defendants failed to answer the original complaint filed by Comdyne in April 1987 within the time period provided for under the court's Local Rules, but instead sought pre-answer discovery and an extension of time in which to answer. On June 25, 1987 Comdyne notified defendants' counsel that it would move, *inter alia*, pursuant to Rule 37(d) of the Federal Rules of Civil Procedure for an order directing defendants to pay its reasonable expenses incurred because of the failure of George Corbin and his wife, Tedi Corbin, who was President of Corbin Superior Composites, Inc., to appear for depositions which had been scheduled for June 18, 1987. Following a hearing the magistrate, by order dated August 6, 1987, permitted the defendants to file their answer by August 28, ordered discovery for both parties, and imposed a sanction against defendants of $250 for failing to appear at the depositions. The district court affirmed the sanctions.

On October 26, 1987, the district court sanctioned Corbin's then-counsel $250 for failing to timely file opposition papers to Comdyne's motion to dismiss, which had been filed September 21, 1987, or to properly request an extension of time to file such papers, pursuant to the Local Rules.

On November 10, 1987, the district court ordered the defendants to respond to two sets of interrogatories and document requests by Comdyne on or before November 17, 1987. The defendants, however, provided incomplete answers to a number of interrogatories and failed to produce a number of the requested documents. They also failed to respond to a third set of interrogatories served on them by Comdyne on November 24, 1987. Consequently, in an order dated May 27, 1988, the magistrate ordered the defendants to fully answer specified interrogatories and to comply with the document requests by June 10, 1988. As a result of defendants' failure to comply with that order, on July 20, 1988 the magistrate ordered defendants, pursuant to Rule 37(b)(2) of the Federal Rules of Civil Procedure, to pay $500 and to comply with the May 27 order.

At the close of discovery on September 2, 1988, after the Clerk entered the default, Comdyne filed a motion for partial summary judgment and a motion to strike Corbin's answer and counterclaim for failure to comply with the May 27 and July 20 orders. On October 24, 1988 following a hearing, the magistrate found that the defendants' refusal to comply with the orders dated May 27 and July 20, 1988 was "willful, unjustified and in bad faith," App. at 282–83, ordered defendants to comply with these orders and pay an additional $1,000 in sanctions by November 18, and warned that failure to do so would result in their answer and counterclaims being stricken. On November 29, 1988, the magistrate, not-

ing that defendants failed to comply with the October 24 order imposing sanctions, entered an order striking the defendants' amended answer and counterclaim pursuant to Fed.R.Civ.P. 37(b)(2).[1] In a subsequent Report and Recommendation on Comdyne's motion for summary judgment, the magistrate recommended that the motion be denied as moot because Corbin's answer and counterclaim had been struck.

The district court held an evidentiary hearing on May 18, 1989 pursuant to Fed. R.Civ.P. 55(b)(2) in order to determine the amount of damages to which Comdyne was entitled as a result of the default entered on July 7, 1988 for Comdyne on its amended complaint. At the hearing, Comdyne presented evidence to support its claim of damage consisting of the value of time which three of its employees spent in attempting to mitigate the damage to its reputation in the government contracting community caused by Corbin's defamatory statements, the expense it incurred in undertaking retesting of the composite cylinders to demonstrate that the cylinders met government specifications, and the time spent by Comdyne employees in responding to a newspaper article that appeared in the *Pittsburgh Press* in October 1988 containing a picture of Corbin and quoting his allegations that Comdyne's cylinders were defective. Although Corbin's counsel was at the evidentiary hearing, neither Corbin nor any other representatives of the defendants appeared or offered any testimony.[2]

In an opinion entered on October 17, 1989, the district court first held that the record warranted entry of a default judgment in light of the six factors enunciated by this court in *Poulis v. State Farm Fire and Casualty Co.*, 747 F.2d 863 (3d Cir. 1984). The court next held that plaintiffs had established liability for the product disparagement and trade libel claims, as all well-pleaded allegations in a complaint, except those relating to the amount of damages, are admitted as true following a default.

Turning to the issue of damages, the court adopted in its entirety the summary of compensatory damages submitted by Comdyne and found that Comdyne was entitled to compensatory damages in the amount of $50,233.88 under Counts Four and Five of the complaint. The compensatory damages included (1) $40,540 for the retesting of the cylinders, and (2) the value of the time of Comdyne employees expended in attempting to reduce or avert the damage flowing from the defamation, consisting of $2,079 in billable time of Berrisford, $300 in billable time of Franklin G. Buck, Comdyne's Executive Vice President, and $2,193.75 in billable time of Richard Swan, Comdyne's marketing manager, and the out-of-pocket cost of $5,121.13 for travel expenses incurred by Berrisford and Swann. The court also awarded Comdyne $10,000 in punitive damages. Finally, the court adopted the magistrate's Report and Recommendation of January 5, 1989 dismissing Comdyne's motion for summary judgment as moot in light of the previous striking of the defendants' counterclaims.[3]

On November 6, 1989, the district court entered a "final judgment by default" in accordance with its October 13, 1989 memorandum and order. This timely appeal followed.[4]

---

**1.** At that time, the magistrate stated that the case would proceed "solely on plaintiff's affirmative claims." App. at 286. There is no indication on the record that the magistrate was aware of the Clerk's entry of default on those claims on July 7, 1988.

**2.** At the evidentiary hearing, the district court denied the request of Corbin's counsel for a jury trial on the issue of damages. Although Corbin was arguably entitled to a jury trial under Fed. R.Civ.P. 55(b)(2), he does not raise this issue on appeal, and we therefore need not consider it.

**3.** In its opinion, the court also sanctioned the defense counsel and held that the president of

Comdyne should not be recalled for further testimony on the issue of damages. The parties have not challenged either of these orders on appeal and we therefore need not consider them.

**4.** Although the court's orders did not explicitly dispose of Comdyne's first three counts, which alleged federal trade name infringement, federal unfair competition, and infringement and unfair competition under New Jersey law, it is evident from the record that these counts were moot by the time of the district court's November 6, 1989 order because Comdyne, in its brief in support of its motion to enter default judg-

## II.

### *Liability*

Although on appeal defendants focus primarily on the issue of the appropriateness of punitive damages and certain elements of compensatory damages, they also challenge the striking of the answer and counterclaim and the entry of default judgment. We note that there were, in effect, two sanctions entered for separate and distinct reasons. The default judgment was entered pursuant to Rule 55 which authorizes the clerk of court to enter a default against a defendant who has failed to file a timely answer, *see* Fed.R.Civ.P. 55(a), and the court to enter a default judgment when the plaintiff's claim is not for a sum certain, *see* Fed.R.Civ.P. 55(b)(2), as here. The striking of the counterclaim was entered pursuant to Rule 37(b)(2)(C), which authorizes such a sanction against a party for failure to obey an order to provide or permit discovery.

As a preliminary matter, we refer to this court's opinion in *Dunbar v. Triangle Lumber and Supply Co.*, 816 F.2d 126 (3d Cir.1987), a case involving a district court order dismissing the plaintiff's complaint under Fed.R.Civ.P. 41(b)[5], where we invoked our supervisory power to require district courts, upon a motion for dismissal or default judgment "based on an apparent default on the part of a litigant's counsel," to "direct the clerk of the court to mail notice directly to the litigant of the time and place of a hearing on any such motion." *Id.* at 129.

Entry of a default judgment under Rule 55 is plainly covered by *Dunbar*.[6] Although there may not have been strict compliance with *Dunbar*, an issue defendants do not raise but which we review on our own initiative, we believe the record shows adequate notice to Corbin. On March 7, 1989, Comdyne notified Corbin's counsel that it would move for an order scheduling a hearing to consider evidence for the purpose of entering a default judgment pursuant to Fed.R.Civ.P. 55(b)(2). By that time, the defendants themselves had been sanctioned in money damages on three different occasions spanning the period from August 1987 through November 1988.

Corbin's actual knowledge of the May 18 hearing is demonstrated by his certification filed April 10, 1989, where he requested "that the Court deny the plaintiff's Motion for a hearing preliminary to entry of default judgment, and that it permit the reinstatement of my Answer and Defenses." Supp.App. at 7. Corbin's wife Tedi, who as noted above was President of Corbin Superior Composites, Inc., filed a certification on April 10, 1989, similarly "request[ing] that the Court not rule on the plaintiff's request for a hearing preliminary to the entry of default judgment, based on our sanctions which have been imposed against us." Supp.App. at 20. In light of the defendants' awareness of the pending motion for a default judgment,[7] the underly-

---

ment, stated that it was only seeking injunctive relief, and not damages, on the first three counts, and Tedi Corbin averred in an affidavit submitted on April 10, 1989 that Corbin Superior Composites, Inc. was no longer using the "CSC" logo or identifying itself as "formerly Corbin Sales Corporation," the basis for the requested injunctive relief. Neither party suggests that these counts remained pending following the entry of the November 6 order denominated by the court as a "final judgment by default". We therefore find no impediment to our appellate jurisdiction.

5. Rule 41(b) provides, *inter alia,* that "[f]or failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant." Fed.R.Civ.P. 41(b).

6. In *Dunbar*, the Rule 41(b) dismissal had been entered in light of the plaintiffs' counsel's repeated failure to prosecute the case by failing to appear at court scheduled pre-trial conferences and hearings. The court invoked its supervisory power specifically in regard to dismissals and default judgments "based on an apparent default on the part of a litigant's counsel." 816 F.2d at 129. In this case, as discussed in the text *infra,* there is an adequate basis to show Corbin's awareness of the default and responsibility for at least some of the events which were the basis for the sanctions imposed.

7. We note that the record shows that at the May 18, 1989 hearing, the court asked Corbin's counsel whether defendants wished to offer any evidence and counsel responded that "I'd like to have a chance to discuss [that] with my clients. They are not here obviously." App. at 605. The

ing basis for *Dunbar* was satisfied. *See Curtis T. Bedwell & Sons v. Int'l Fidelity Ins. Co.*, 843 F.2d 683, 693 n. 19 (3rd Cir. 1988) (court conference and hearing "effectively notified" plaintiff of attorney misconduct, thereby satisfying *Dunbar*).

We consider then whether the district court abused its discretion in entering the default judgment and in striking the answer and counterclaim.[8]

This court has applied the same general analysis in reviewing all sanction orders which deprive a party of the right to proceed with or defend against a claim, using some or all of the six-part test enunciated in *Poulis v. State Farm Fire and Casualty Co.*, 747 F.2d 863, 868 (3d Cir.1984). *See, e.g., Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 73–74 (3d Cir.1987); *Gold Kist, Inc. v. Laurinburg Oil Co.*, 756 F.2d 14, 19 (3d Cir.1985). Under the *Poulis* test, the district court must consider:

(1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.

*Poulis*, 747 F.2d at 868 (emphasis omitted).

Applying the *Poulis* factors, the district court first found that "[t]he record demonstrates defendants' personal responsibility

in that they were personally sanctioned on three separate occasions for discovery misconduct which ultimately led to the entry of default." App. at 312. The court further found that Comdyne has had to incur expenses in defending against a meritless counterclaim for over a year and in so doing has suffered prejudice; that the defendants and their counsel had a long history of dilatoriness as evidenced by their failure to comply with discovery orders; that the defendants presented no evidence demonstrating that their defenses or counterclaims are meritorious; and that a default judgment was an appropriate sanction.

On appeal, defendants only contest the district court's finding that they bore personal responsibility for the discovery abuses,[9] contending that insufficient evidence was introduced demonstrating that the defendants were the cause of the discovery misconduct or that their counsel informed them of the sanctions and the trial date. Consequently, they argue that we should remand for a determination of their personal responsibility.

The record, however, establishes that defendants did in fact have continuing knowledge of the tortuous course of this litigation. In a certification under oath submitted to the district court on August 12, 1988, at which time the defendants had already been fined $750 in two separate orders,[10] George Corbin claimed that newly discovered information "would have been of extreme importance in the Court's initial ruling on plaintiff's Motion to compel dis-

court gave counsel that opportunity and scheduled a conference call for the next day. The court thereafter rejected defendants' request to recall Berrisford, and defendants offered no additional evidence.

8. The order striking the answer and counterclaim was a dispositive order which the magistrate by statute can only recommend but not enter. *See* 28 U.S.C. § 636(b)(1). There is no order by the district court formally striking the counterclaim. However, Corbin did not file objections to the magistrate's order with the district court, *see* 28 U.S.C. § 636(b)(1)(C), nor does he raise that issue before this court. It is therefore waived. Moreover, the district court's opinion evidences awareness of and approval of the magistrate's order.

9. We note that there is, in any event, adequate support in the record for the district court's findings on the other *Poulis* factors. Significantly, even on appeal Corbin asserts no claim that its counterclaim was meritorious. Moreover, we have previously noted that "a client cannot always avoid the consequences of the acts or omissions of its counsel." *Poulis*, 747 F.2d at 868 (citing *Link v. Wabash*, 370 U.S. 626, 633, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962)).

10. As discussed earlier, the defendants were fined $250 in an order dated August 6, 1987 and $500 in a July 20, 1988 order.

covery and for sanctions, and respectfully submit that this entitles me and my employer to reconsideration of the initial order. We have not been simply defying the Court's authority in this regard...." Supp.App. at 5. Similarly, in a certification submitted to the court on November 18, 1988, following the October 24, 1988 imposition of $1,000 in sanctions, Corbin requested that the court grant him a limited amount of time to retain an attorney "so that we can comply with our discovery obligations to the Court." Supp.App. at 14. Corbin further requested "that the Court reconsider the presently outstanding sanctions against us," that the defendants' inability to answer the interrogatories was based on its "dire financial straits" and "has not been based on a contemptuous position towards the Court," and that "in light of ... new information, we would request that the Court reconsider its presently outstanding Order." Supp.App. at 15. Finally, in her April 10, 1989 certification, Tedi Corbin specifically "request[ed] that the court deny the plaintiff's request that our attorney be sanctioned. He has bent over backwards to help us, is owed tremendous sums of money by us that we simply cannot pay at this time, and should not be faulted for believing his own clients and their documentation." Supp.App. at 20–21.

Despite their knowledge of the pending sanctions and discovery orders, the defendants nevertheless continued to remain intransigent in their defiance of these orders. Although their affidavits in the district court attribute their failure to comply to their financial situation, unlike their position here shifting responsibility to their attorney, the district court was entitled to find, after almost two years in which defendants parried discovery requests and orders, that the conduct of both defendants and their trial counsel could no longer be countenanced. We therefore uphold the entry of default judgment and the striking of the answer and counterclaim.

### III.

#### *Damages*

A consequence of the entry of a default judgment is that "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." 10 C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure,* § 2688 at 444 (2d ed. 1983) (citing *Thomson v. Wooster,* 114 U.S. 104, 5 S.Ct. 788, 29 L.Ed. 105 (1885)). If the damages are not for a "sum certain or for a sum which can by computation be made certain," Fed.R.Civ.P. 55(b)(1), the "court may conduct such hearings or order such references as it deems necessary and proper." Fed.R.Civ.P. 55(b)(2). Corbin challenges the district court's award of both compensatory and punitive damages to Comdyne.

#### A.

#### *Compensatory Damages*

Corbin first contends that the court erred in awarding Comdyne compensation for the damages which it incurred in attempting to mitigate damages to its reputation flowing from the defendants' defamatory statements. Corbin argues that only three categories of damages are recoverable for defamation under New Jersey law: punitive damages, which require a showing of actual malice or recklessness; special damages, which require a showing of a loss of business flowing from the defamation; and general damages, which are presumed without proof of any special damages. Corbin argues that costs incurred in mitigating damages do not fall within any one of these categories.

This argument overlooks the principle, established in New Jersey as elsewhere, that "tort law require[s] one wronged by the action of another to mitigate damages." *Harvard v. Bushberg Bros., Inc.,* 137 N.J. Super. 537, 542, 350 A.2d 65, 68 (App.Div. 1975), *cert. granted,* 71 N.J. 493, 366 A.2d 649 (1976) (dismissed by stipulation); *see also Martin Marietta Corp. v. New Jersey Nat'l Bank,* 653 F.2d 779, 784–85 (3d Cir. 1981). As a corollary, New Jersey courts have held that a wronged party can recover for "expenditures made in a reasonable effort" to avert the harm caused by the

defendant. *Henry Clay v. Jersey City*, 74 N.J.Super. 490, 497, 181 A.2d 545, 549 (Ch. Div.1962), *aff'd*, 84 N.J.Super. 9, 200 A.2d 787 (App.Div.1964); *see also Smith v. Okerson*, 8 N.J.Super. 560, 566, 73 A.2d 857, 860 (Ch.Div.1950) ("[p]rudent, reasonable expenses incurred [in mitigating damages] may be recovered as damages").

Although we are not aware of any New Jersey cases which have considered a recovery of mitigation costs in the context of a defamation action, we see no reason why New Jersey would depart from the general rule in this specific context. Courts in other states that have considered this precise issue have held that such costs are recoverable in defamation actions. *See, e.g., Bolduc v. Bailey*, 586 F.Supp. 896, 901–02 (D.Colo.1984); *Wachs v. Winter*, 569 F.Supp. 1438, 1446, 1448 (E.D.N.Y. 1983); *Den Norske Ameriekalinje Actiesselskabet v. Sun Printing & Publishing Ass'n*, 226 N.Y. 1, 122 N.E. 463 (1919) (*cited with approval* in *Okerson*, 8 N.J.Super. at 566, 73 A.2d at 857).

■ Corbin, relying on *Chatlos Sys. v. Nat'l Cash Register Corp.*, 479 F.Supp. 738 (D.N.J.1979), *aff'd in part*, 635 F.2d 1081 (3d Cir.1980), *cert. dismissed*, 457 U.S. 1112, 102 S.Ct. 2918, 73 L.Ed.2d 1323 (1982), next contends that even if mitigation costs incurred by Comdyne's executives are recoverable as a general proposition, the time spent by Robert F. Berrisford, the President and Chief Executive Officer of Comdyne, is not recoverable. In *Chatlos*, a case arising under the Uniform Commercial Code, the district court held that although the plaintiff was entitled to damages for executive time spent as a result of the defendant's breach, it was not entitled to the time spent by the Chief Executive Officer because "he assumed the risk of all corporate problems." 479 F.Supp. at 747. We did not reach that issue on appeal.[11]

Again, we have found no New Jersey cases directly on point. However, in light

of our prediction that the New Jersey Supreme Court would adopt the general rule that a party in a defamation action can recover for mitigation costs, we believe that New Jersey would not carve out an exception for chief executive officers but instead would follow the persuasive reasoning of the Sixth Circuit which, in explicitly rejecting the district court's distinction in *Chatlos*, reasoned that "[a] chief executive officer is a salaried employee like any other, and a distinction between him or her and other, lower level executives is unjustified. In either case, the corporation is paying for their time." *Dunn Appraisal Co. v. Honeywell Information Sys.*, 687 F.2d 877, 884 (6th Cir.1982). It follows that the district court did not err in allowing damages for Berrisford's lost time flowing from Corbin's defamatory statements.

For similar reasons, we reject Corbin's contention that the district court erred in awarding damages of $2,193.75 in lost time and $4,728.01 in travel expenses for visits by Comdyne's marketing manager, Richard Swann, to customers to alleviate concerns arising from the defamatory statements. Corbin argues that visits to customers is a part of Swann's job responsibility and that damages should not be awarded for such visits, regardless of whether they were extra visits made because of the defamatory statements. However, there was testimony by Berrisford, credited by the district court, that Swann had to double the number of his visits because of the defamatory statements, *see* App. at 480–81, which suffices to support this element of damages flowing from the wrong.

■ Corbin next challenges the award of $40,540 for the retesting of the cylinders, arguing that the need for such retesting was not proximately caused by the defamatory statements. Corbin argues that Berrisford had acknowledged that the major cause of the need for the retesting was the fall-out from the *Pittsburgh Press* article,

---

**11.** We affirmed the district court's finding of liability on the contract claim, but reversed the district court's award of consequential damages, including lost executive time, on the ground that the plaintiffs had contractually bargained away their right to such damages. 635 F.2d at 1086–87.

the design changes in the cylinders, and the length of time since the last test.

The district court did rule that "the actions taken by the plaintiff in response to the *Pittsburgh Press* article should not be considered by me as an element of damages," App. at 511, and thereafter held that they were not a "compensable matter of damages," App. at 513.[12] Comdyne has not challenged that ruling on appeal, and thus we do not address the merits of that ruling. We note that notwithstanding this ruling, the court accepted *in toto* Comdyne's summary of damages, which included 8.8 hours of Berrisford's time (at $45/hour) and 3 hours of Comdyne's Executive Vice President, Franklin G. Buck (at $50 dollars/hour), clearly identified as time spent in responding to the article.[13] We will therefore vacate its order and remand so that the court can deduct from the award these costs which were listed as flowing only from the article.

■ The fact that the damages from the *Pittsburgh Press* article were determined to be non-compensable does not mean that the cost of retesting of the cylinders, attributable in part to that article, is not a proper item of damages. Notwithstanding that a tortfeasor "is liable only for that harm that he proximately cause[s]," *People*

*Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 N.J. 246, 253, 495 A.2d 107, 110 (1985), where a harm is produced by concurrent acts, each act is the cause of the harm if it was a material element or "substantial factor" in bringing the harm about. *See Scafidi v. Seiler*, 119 N.J. 93, 104, 574 A.2d 398, 403 (1990); Restatement (Second) of Torts § 431 (1979).

There was evidence from which the district court could have concluded that the defamatory statements made by Corbin other than those reported in the *Pittsburgh Press* article were a substantial cause for the need to retest the cylinders. At the hearing, the district court engaged in the following exchange with Berrisford:

> The Court: Well, was the test done because it hadn't been done in some time, or was the test done because of the assertions by Mr. Corbin, or both?
>
> The Witness: ....
>
> In this case, the government had not specifically required us to [retest], and we were still in production. However, we felt *based on all these allegations* that in fact, it was in our best interests to do one and pay for it ourselves, basically to satisfy everybody, and to remove any question that in fact the Navy might require one in the future or something.

12. The court excluded evidence of the *Pittsburgh Press* article both because it had not been included in the amended complaint and because it would be "difficult, if not impossible," to separate the harm flowing from the publicity in the lawsuit (which presumably would not be actionable) and that flowing from the article itself. App. at 513.

13. Comdyne included the following items in their summary of damages for Berrisford:

| Date: | Description: | Hours: |
|---|---|---|
| 10/17/88 | Discussed *Pittsburgh Press* article with Franklin G. Buck, Robert Hilgendorf and others | 3.0 |
| 10/18/88 | Telephone conference with NAVSEA—Robert Flynn; discussion with Robert Hilgendorf concerning *Pittsburgh Press* article | 1.2 |
| 11/4/88 | Discussed *Pittsburgh Press* article with representatives of Columbia Gas | 1.1 |
| 11/4/88 | Drafted letter on background relating to *Pittsburgh Press* article for Columbia Gas Management; discuss letter with G. Moore | 3.5 |

App. at 294–95.

The relevant entry for Buck was:

| 10/17/88 | Discussed *Pittsburgh Press* article with Robert S. Berrisford, Robert Hilgendorf and others | 3.0 |
|---|---|---|

App. at 296.

The Court: Is this a normal updating test that you would have done, had there not been any allegation by the defense? The Witness: No, sir. The normal updating test that you do, we had continued to do. Out of every 200 cylinders that we build, we test two of those to destruction, to assure consistent quality, that nothing has changed, if you will. This test was done totally in addition to that. The Court: Why did you do that test? The Witness: Sir, we did the test specifically because of our concerns, *both* with the things in the *Pittsburgh Press and letters that had been written,* that we had changed our cylinder, that it was not a valid cylinder, it wouldn't pass the test, and so on. And we did it basically to be able to go to our customers and everybody else and say, look, it's just not true. The Court: Who had made those charges? The Witness: Those charges were all made by Mr. Corbin and documented *in letters to the Navy* and to the *Pittsburgh Press, and* to Rubber Crafters. App. at 503–04 (emphasis added).

■ Thus, even if the *Pittsburgh Press* article were considered to be one of the substantial causes of the retesting, damages are apportionable among concurrent causes only if there are "distinct harms" or if "there is a reasonable basis for determining the contribution of each cause to a single harm." Restatement (Second) of Torts § 433A (1979); *see also Scafidi,* 119 N.J. at 110–14, 574 A.2d at 407–08. In such instances, the burden shifts to the defendant to demonstrate how the damages should be apportioned among the concurrent causes. *See Fosgate v. Corona,* 66 N.J. 268, 272–73, 330 A.2d 355, 358 (1974); Prosser and Keeton, Law of Torts § 52 at 350–51 (5th ed. 1984). Where the harm, however, is indivisible, there is no apportionment of damages among the concurrent causes. *See* Restatement (Second) of Torts § 433A (1979).

In this case, we need not decide whether the retesting is an indivisible harm which cannot be apportioned under any circumstances, or whether it is divisible and there-

fore apportionable, as Corbin never introduced any evidence at trial on the issue of apportionment. As Corbin did not meet his burden of proof on this issue, the district court did not err in awarding $40,540 in damages for the retesting.

### B.

#### *Punitive Damages*

We turn finally to Corbin's contention that the district court erred in awarding punitive damages in the amount of $10,000. Corbin argues that actual malice must be shown in order to award punitive damages, that malice cannot be presumed from the complaint following a default judgment, and that Comdyne did not introduce any evidence of malice at the Rule 55 hearing.

■ Corbin is correct that under New Jersey common law punitive damages in a defamation action may be awarded only upon proof of actual malice, which requires a showing of ill-will or wrongful intent to injure. *See Weir v. McEwan,* 94 N.J.L. 92, 109 A. 355 (1920); *Bock v. Plainfield Courier–News,* 45 N.J.Super. 302, 132 A.2d 523 (App.Div.1957). As a general proposition, punitive damages cannot be awarded simply on the basis of the pleadings, but must instead be established at an evidentiary hearing held pursuant to Fed. R.Civ.P. 55(b)(2) because they clearly are not liquidated or computable. *See, e.g., Flaks v. Koegel,* 504 F.2d 702, 707 (2d Cir.1974); *Meehan v. Snow,* 494 F.Supp. 690, 697–98 (S.D.N.Y.1980).

■ In this case, the court entered an order setting "a hearing to consider the plaintiff's evidence of damages for the purpose of entering judgment by default against defendants on May 18 at 9:00 a.m." App. at 327. Thereafter, the court did in fact hold a Rule 55(b) hearing for the explicit purpose of assessing damages. As noted above, neither Corbin nor his wife appeared and no employee of their companies offered any evidence. At the hearing, Comdyne's counsel explained that he sought to establish punitive damages from testimony from the defendants, but that the absence of defendants hampered that

course. While Comdyne could have subpoenaed Corbin had it known he would not appear, we believe that there was adequate evidence beyond the mere pleadings to show the type of actual malice that would support punitive damages.

At the evidentiary hearing, Comdyne submitted into evidence a letter dated June 25, 1987 written by George Corbin to a customer asserting that "in my opinion, the actions of Comdyne/Johnson borders [sic] criminal fraud on the U.S. Gov't by their own admissions and records, if not in actual fact, done to cover-up their own incompetence and for their own monetary gain." App. at 82. Similarly, in a July 20, 1987 letter to an official of the United States Navy, Corbin, referring to Comdyne, claimed that the Navy "had been provided untrue and misleading information by unscrupulous people, who are willing to engage in criminal fraud for their own personal gain." App. at 104. In a letter to another Navy official, dated July 29, 1987, George Corbin contended that Comdyne "embarked on a program which was unethical and even criminal fraud," App. at 116, that Comdyne provided "misleading information" to the government, App. at 115, and that "the deceit and criminal fraud, in my opinion, was perpetrated by Comdyne/Johnson on the U.S. Gov't. In my opinion, such contractors should be barred from doing business with the U.S. Gov't." App. at 114.

In the absence of any evidence whatsoever submitted by Corbin to justify the defamatory allegations,[14] this evidence of allegations of "criminal fraud" by a competitor against a company which depended in large part on government contracts for its business supports a finding of actual malice.[15]

## IV.

### Conclusion

In conclusion, we have determined that the district court's orders entering default judgment and striking the counterclaim will be affirmed. We note that we have given considerably more attention to these orders than have the appellants, whose brief treats these issues somewhat summarily in a scant two and a half pages, because of our continuing concern with sanction orders pretermitting merits consideration. We cannot conclude, however, that in this case, the entry of these orders was an abuse of discretion. For the reasons set forth above, we will affirm the order fixing compensatory and punitive damages except that we will vacate the order to the extent that it includes the items attributable only to the *Pittsburgh Press* article, and remand this action so that the district court can eliminate from the compensatory damage award the items referred to in note 13 of this opinion. Costs on appeal to be assessed against the appellants.

FULLAM, District Judge, dissenting.

In *Dunbar v. Triangle Lumber & Supply Co.*, 816 F.2d 126, 129 (3d Cir.1987), this court, invoking its supervisory power

---

**14.** We note that the district court assessed the $10,000 punitive damages award based on documents submitted by the plaintiffs concerning the assets of the defendants. *See Leimgruber v. Claridge Assoc., Ltd.,* 73 N.J. 450, 456, 375 A.2d 652, 655–56 (1977) (court must consider, *inter alia,* wealth of perpetrator when awarding punitive damages).

**15.** Corbin's brief focuses primarily on the absence of evidence to meet the common law standard of actual malice. Although Corbin alludes in passing to the constitutional malice standard which precludes in certain circumstances presumed or punitive damages when liability "is not based on a showing of knowledge of falsity or reckless disregard for the

truth," *see Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974), his brief on appeal does not point to any place in the record where this issue was raised in the district court. This court has frequently stated that we will not consider on appeal issues that the parties failed to present to the district court. *See Flick v. Borg–Warner Corporation,* 892 F.2d 285, 287–88 (3d Cir.1989); *Halderman v. Pennhurst State School & Hosp.,* 673 F.2d 628, 639 (3d Cir.1982) (in banc), *cert. denied,* 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984). This is particularly appropriate in this case where the district court was apparently not asked by Corbin to consider whether the *Gertz* standard applies in this factual situation.

over district courts within the circuit, established the following rule:

"While it is true that *Poulis* affords some judicial protection to innocent litigants from the consequences of professional defaults, it is evident that such litigants are often *in extremis*, legally speaking. Yet, they are, nevertheless, dependent on their attorneys to protect their interests. A conflict in interest is almost inherent in such a situation ...

"We conclude that any motion, whether by court or counsel, seeking an effective dismissal or default judgment based on an apparent default on the part of a litigant's counsel be pleaded with particularity and with supporting material and that where the papers demonstrate reasonable grounds for dismissal on that basis, *the court shall direct the clerk of the court to mail notice directly to the litigant of the time and place of a hearing on any such motion, reasonably in advance of the hearing date...."*

As the majority recognizes, there was no attempt to comply with this requirement in the present case. Neither the magistrate's order purporting to strike defendant's answer and counterclaim, nor the hearing for the entry of default judgment, was preceded by the required direct notice to Mr. and Mrs. Corbin.

Although there is some indication in the record that the Corbins may have been made aware, through counsel, that sanctions had been imposed, and although their lawyer claimed to have discussed the damage hearing with them by telephone, the record falls far short of demonstrating substantial compliance with the *Dunbar* requirement. The whole purpose of a direct notice from the court to the client is to alert the client to the possible derelictions of counsel, and the looming conflict-of-interest issue; and to make certain that the client is made aware of the need for prompt action, and of the possible inadvisability of continuing to rely exclusively upon counsel's advice and interpretation of litigation developments.

By the time of the damage hearing, defendants' then-attorney, through a series of inexplicable derelictions, had virtually abandoned the litigation. His only response to the application for default judgment was to request a continuance based upon other alleged court commitments and, when that failed, to make a (patently meritorious, but nevertheless rejected) motion for a jury trial, and to request, unsuccessfully, permission to present evidence in the form of additional cross-examination of an officer of the plaintiff. To assume that this attorney adequately alerted the Corbins to their imminent peril, and that no direct notice from the court was necessary, is, I submit, squarely contrary to the *Dunbar* decision—which this panel is, of course, bound to follow. I would therefore vacate the judgment and remand for a new hearing on the motion for default judgment.

Even assuming that *Dunbar* had been complied with and that the *Poulis* factors were properly evaluated, I am of the opinion that there is inadequate evidentiary support in the record for some of the damages awarded. The award included an item of $40,540 allegedly incurred in conducting a re-testing program. The majority upholds this award on the theory that an injured party has an obligation to mitigate damages, that the New Jersey Supreme Court would permit recovery of expenses reasonably associated with mitigation efforts, and that there is no reason to apply a different rule in defamation actions. I agree that there may be situations in which this approach would be permissible, but the evidence in this case does not justify it.

It is clear that the additional testing was not mandated, or even suggested, by any customer or government agency. There was no evidence that plaintiff's status as a defense supplier was actually affected, or jeopardized, by Mr. Corbin's communications. In short, so far as this record is concerned, there were no damages to be mitigated. At the very least, before permitting recovery for a $40,540 expenditure to "mitigate damages", we should require proof of reasonable necessity.

Plaintiff's own witnesses candidly testified that the re-testing program was essen-

tially a public relations effort. I am unwilling to predict that the New Jersey Supreme Court—assuming it would be likely to permit recovery of mitigation damages in defamation cases under some circumstances—would go so far as to permit a defamed plaintiff to impose upon the defendant the costs of a public relations campaign mounted purely as a precautionary measure, without any showing of actual damage or actual need for image-enhancement. For one thing, it is impossible to state whether such an award would overcompensate the injured party, leaving it better off than if the tort had not occurred. At the very least, as discussed above, I am confident that such a plaintiff would be required to prove that, in the absence of the expenditure, damages to its reputation would have been likely to equal or exceed the amount of the expenditure. I would therefore vacate so much of the judgment as awarded $40,540 for re-testing expenses.

Finally, it is my view that the $10,000 punitive damage award cannot be sustained on this record. There was no evidence of actual malice—no proof that the defendant knew his charges were false, or acted in reckless disregard. And even if there had been such evidence, the trial judge made no findings of fact on that subject. The district court seems clearly to have assumed that the failure to file an answer to the amended complaint obviated the need for evidence on that subject.

For all of these reasons, I would vacate the judgment and remand for further proceedings.